**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| CHRIS SIMOES, derivatively on behalf of Nominal Defendant CROWDSTRIKE HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> GEORGE KURTZ, MICHAEL SENTONAS, ROXANNE S. AUSTIN, SAMEER K. GANDHI, GERHARD WATZINGER, CARY J. DAVIS, LAURA J. SCHUMACHER, JOHANNA FLOWER, DENIS J. O'LEARY, and GODFREY R. SULLIVAN, <br><br> Defendants, <br><br> and <br><br> CROWDSTRIKE HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. 1:25-cv-545 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Chris Simoes ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant CrowdStrike Holdings, Inc. ("CrowdStrike" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers, seeking to remedy defendants' breaches of fiduciary duties and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by CrowdStrike with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.      NATURE AND SUMMARY OF THE ACTION

1. CrowdStrike is a cybersecurity company that offers its Falcon platform, which is "designed to be the definitive platform for cybersecurity consolidation, purpose-built to stop breaches." It offers 29 cloud modules on the Falcon platform through a software-as-a-service subscription-based model.

2. Defendants touted the Company's revolutionary platform for its ability to purportedly deliver software updates via the cloud without the apocalyptic "blue screen," *i.e.* a coding error that crashes the entire operating system.

3. Yet on July 19, 2024, CrowdStrike rolled out a software update that crashed 8.5 million devices across industries including healthcare, finance, and travel. It was widely panned as the "most catastrophic IT failure the world has ever seen."

4. The Company admitted that it had failed to adhere to industry standards. It committed to adopting pre-production environment testing and phased rollouts, which were the same safety requirements that Defendants had previously represented CrowdStrike employed.

5.      These revelations precipitated the filing of a securities class action in the District of New Jersey and certain of the defendants named herein, captioned *In re CrowdStrike Holdings, Inc. Securities Litigation*, Case No. 1:24-cv-857 (W.D. Tex.) (the "Securities Class Action"). CrowdStrike also faces multiple consumer class actions, including *Del Rio, et al. v. CrowdStrike, Inc.*, Case No. 1:24-cv-881 (W.D. Tex.) and *Delta Air Lines, Inc. v. CrowdStrike, Inc.*, No. 24-cv-013621 (Ga. Super. Ct. Oct. 25, 2024) (collectively, the "Consumer Litigation").

6.      For these reasons and as set forth in greater detail herein, including the Board's refusal to investigate these matters, Plaintiff now files this action against the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by CrowdStrike and its shareholders.

## II.     JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

9.      Plaintiff is a beneficial owner of, and has continuously held, CrowdStrike Class A common stock.

**Nominal Defendant**

10. Nominal Defendant CrowdStrike is a Delaware corporation with its principal executive offices located at 206 E. 9th Street, Suite 1400, Austin, Texas 78701. The Company's common stock trades on the NASDAQ exchange under the symbol "CRWD."

**Defendants**

11. Defendant George Kurtz ("Kurtz") is a co-founder of the Company and has served as its Chief Executive Officer ("CEO"), President, and a member of the Board since November 2011.

12. Defendant Michael Sentonas ("Sentonas") has served as President of CrowdStrike since March 2023. Prior to that, he was its Chief Technology Officer.

13. Defendant Roxanne S. Austin ("Austin") has served as a member of the Board since September 2018.

14. Defendant Sameer K. Gandhi ("Gandhi") has served as a member of the Board since August 2013.

15. Defendant Gerhard Watzinger ("Watzinger") has served as Chairman of the Board since April 2012.

16. Defendant Cary J. Davis ("Davis") has served as a member of the Board since July 2013.

17. Defendant Laura J. Schumacher ("Schumacher") has served as a member of the Board since November 2020.

18. Defendant Johanna Flower ("Flower") has served as a member of the Board since January 2023.

19. Defendant Denis J. O'Leary ("O'Leary") has served as a member of the Board since December 2011.

20. Defendant Godfrey R. Sullivan ("Sullivan") has served as a member of the Board since December 2017.

21. Defendants Kurtz, Sentonas, Austin, Gandhi, Watzinger, Davis, Schumacher, Flower, O'Leary, and Sullivan are sometimes referred to herein as the Individual Defendants.

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

22. By reason of their positions as officers, directors, and/or fiduciaries of CrowdStrike and because of their ability to control the business and corporate affairs of CrowdStrike, at all relevant times, the Individual Defendants owed CrowdStrike and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage CrowdStrike in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of CrowdStrike and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer of the Company owes to CrowdStrike and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

23. The Individual Defendants, because of their positions of control and authority as directors and/or officers of CrowdStrike, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with CrowdStrike, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

24. To discharge their duties, the officers and directors of CrowdStrike were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of CrowdStrike were required to, among other things:

    (a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    (b) Exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    (c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    (d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background

25. CrowdStrike is a cybersecurity company that offers its Falcon platform, which is "designed to be the definitive platform for cybersecurity consolidation, purpose-built to stop breaches." It offers 29 cloud modules on the Falcon platform through a software-as-a-service subscription-based model.

26. Falcon purported to be a revolutionary cybersecurity product because, unlike legacy products that could not keep up with rapid changes in cyberattack tactics, CrowdStrike delivered its services via the cloud.

27. This enabled the Company to deliver automatic updates through the cloud, rather than requiring customers "to reboot endpoints or manage updates." The remote update system,

called "Rapid Response," was a key differentiator of the Company as it "allows for rapid, frequent, and reliable code updates" that replace "manual, legacy methods of deploying code to ensure faster and more secure updates."

28. CrowdStrike purportedly employs CI/CD delivery, also known as continuous integration and continuous delivery, which "is a software development methodology that allows for rapid, frequent, and reliable code updates." Before the release of an update, CrowdStrike purportedly deploys software updates to a "staging environment that closely resembles the production environment" for "further testing," including "[p]erformance testing, security testing, user acceptance testing (UAT), and other testing."[1]

### B. The Individual Defendants Issued Materially Misleading Statements

29. In CrowdStrike's registration statement filed in connection with its June 2019 initial public offering, and in every Form 10-K filed and signed by CrowdStrike's Board since then, the Company recognizes that "[i]f our solutions fail or are perceived to fail to detect or prevent incidents or have or are perceived to have defects, errors, or vulnerabilities, our brand and reputation would be harmed, which would adversely affect our business and results of operations." *See, e.g.*, Form 10-K for the reporting period ended January 31, 2024 at 27.

30. Similarly, CrowdStrike's Form 10-Ks for fiscal 2023 and 2024 (filed on March 9, 2023 and March 7, 2024, respectively), stated that the Company's "technical staff monitors and tests our software on a regular basis" and "[w]e also maintain a regular release process to update and enhance our existing solutions." These Form 10-Ks were signed by Defendants Kurtz, Austin,

---

[1] *What is CI/CD?: Pipeline Benefits and Tools*, CrowdStrike (July 4, 2024), https://www.crowdstrike.com/en-us/cybersecurity-101/cloud-security/continuous-integration-continuous-delivery-ci-cd/.

6

Gandhi, Watzinger, Davis, Schumacher, O'Leary, and Sullivan. The fiscal 2024 Form 10-K was also signed by Defendant Flower.

31. Thus, investors had reason to believe that the Board would oversee risks associated with CrowdStrike's software solutions and ensure that the Company instituted sufficient internal controls for testing its software prior to distribution.

32. This misleading representation was reinforced by other public statements by Defendants. For example, on September 20, 2022, Defendants Kurtz and Sentonas participated at the Company's annual Fal.Con conference, during which Defendant Kurtz stated that "[t]esting and validation is really important. We test more than anyone else, more than all of our next-gen competitors, more than other players that are out there."

33. On April 4, 2023, Defendants Kurtz and Sentonas participated at CrowdStrike's Investor Briefing. During the briefing, Defendant Sentonas claimed that one of CrowdStrike's key differentiators is its "agent cloud architecture [which] ensures that every agent is always up to date with the latest protection. *It doesn't require a massive tuning burden and doesn't blue screen endpoints with failed updates.*"[2]

34. On August 30, 2023, CrowdStrike held a conference call in connection with its second quarter 2024 financial results. During the call, Defendant Kurtz touted the Company's ability to "understand if insecure code is being put into the CI/CD pipeline."

35. Similarly, on September 5, 2023, Defendant Kurtz participated at Goldman Sachs' Communacopia Conference on behalf of CrowdStrike. He highlighted the Company's "ability to help make sure that code is secure, that it's deployed and that it's run in a secure environment."

---

[2] Emphasis added unless otherwise noted.

36. On November 28, 2023, CrowdStrike held a conference call in connection with its third quarter 2024 financial results. During the call, Defendant Kurtz assured that Falcon software updates avoid "blue screen" errors, stating: "We've got many, many airlines that use our technology. *They don't want to send out an IT person to go fix a kiosk that has a Microsoft blue screen. So what can they do? They can use Falcon for IT*."

37. Similarly, on December 29, 2023, Defendant Kurtz was interviewed by "The Compound," during which he stated: "We have airlines that you know when the kiosk is kind of blue screened, *you know when you go through the airport and you see the Microsoft blue screen, they actually, yeah well they actually use our technology to fix it*."

38. The foregoing statements were materially false and/or misleading because they omitted to disclose that: (1) CrowdStrike did not have a "release process" for software updates or test its upgrades in a preproduction environment; (2) CrowdStrike did not "monitor and test" its software regularly; and (3) the Company lacked a dedicated quality assurance team to ensure CrowdStrike adhered to industry standard test plans for its software updates.

C. **The Truth Begins to Emerge**

39. On July 19, 2024, a faulty Falcon content update triggered the "largest IT outage in history," affecting approximately 8.5 million devices running Microsoft Windows (the "Outage").[3] The Outage's impact on the economy was pervasive, including: in finance, online banking services and trading platforms were disrupted; in healthcare, access to patient records was difficult, some emergency rooms were closed, and 911 systems in several countries and states in the U.S. were

---

[3] Ruxandra Iordache et al., *Microsoft-CrowdStrike issue causes 'largest IT outage in history,'* CNBC (July 19, 2024), https://www.cnbc.com/2024/07/19/latest-live-updates-on-a-major-it-outage-spreading-worldwide.html.

down; and, in transportation, over 1,100 flights were cancelled and more than 2,000 were delayed in the U.S. alone.[4]

40. On this news, the Company's stock price fell approximately 11% to close at $304.96 per share on July 19, 2024, on unusually heavy trading volume.

41. On July 22, 2024, the U.S. House of Representatives Homeland Security Committee called on Defendant Kurtz to testify regarding the Outage. On this news, the Company's stock price fell approximately 13.5% to close at $263.91 per share.

42. A July 23, 2024 article recognized that CrowdStrike failed to use a progressive content update rollout, or a canary deployment, even though "[i]t's a fairly standard practice to roll out updates gradually, letting developers test for any major problems before an update hits their entire user base."[5]

43. On July 24, 2024, CrowdStrike released its Preliminary Post Incident Review ("PIR") that purported to describe the underlying causes of the Outage. Specifically, it stated, in relevant part:

> On July 19, 2024, two additional IPC Template Instances were deployed. Due to a bug in the Content Validator, one of the two Template Instances passed validation despite containing problematic content data.
>
> Based on the testing performed before the initial deployment of the Template Type (on March 05, 2024), trust in the checks performed in the Content Validator, and previous successful IPC Template Instance deployments, these instances were deployed into production.
>
> When received by the sensor and loaded into the Content Interpreter, problematic content in Channel File 291 resulted in an out-of-bounds memory read triggering

---

[4] *July 19, 2024 Incident : When an Update Has Global Impacts*, PREMIER CONTINUUM (last visited October 22, 2024), https://www.premiercontinuum.com/resources/microsoft-outbreak-july-2024.

[5] Tom Warren, *Inside the 78 minutes that took down millions of Windows machines*, VERGE (July 23, 2024), https://www.theverge.com/2024/7/23/24204196/crowdstrikewindows-bsod-faulty-update-microsoft-responses

an exception. This unexpected exception could not be gracefully handled, resulting in a Windows operating system crash (BSOD).

44. To prevent this from happening again, CrowdStrike committed to implementing certain monitoring and testing improvements, including:

**Rapid Response Content Deployment**

- *Implement a staggered deployment strategy for Rapid Response Content in which updates are gradually deployed to larger portions of the sensor base, starting with a canary deployment.*

- Improve monitoring for both sensor and system performance, collecting feedback during Rapid Response Content deployment to guide a phased rollout.

- Provide customers with greater control over the delivery of Rapid Response Content updates by allowing granular selection of when and where these updates are deployed.

- Provide content update details via release notes, which customers can subscribe to.

45. On September 12, 2024, *SEMAFOR* reported that former CrowdStrike software engineers "complained about rushed deadlines, excessive workloads, and increasing technical problems to higher-ups for more than a year before a catastrophic failure of its software paralyzed airlines and knocked banking and other services offline for hours."[6] In short, according to one of those former employees, "[q]uality control was not really part of our process or our conversation."

D. **The Individual Defendants Caused CrowdStrike To Issue A Materially Misleading Proxy Statement**

46. On May 6, 2024, Defendants Kurtz, Austin, Gandhi, Watzinger, Davis, Schumacher, Flower, O'Leary, and Sullivan caused CrowdStrike to issue a definitive proxy statement soliciting stockholder votes in advance of the special meeting to be held June 18, 2024

---

[6] Rachyl Jones, *CrowdStrike ex-employees: 'Quality control was not part of our process'*, SEMAFOR (Sept. 12, 2024), https://www.semafor.com/article/09/12/2024/ex-crowdstrikeemployees-detail-rising-technical-errors-before-july-outage.

(the "2024 Proxy"). These seven Defendants solicited stockholder votes in favor of three management proposals, including the election of Austin, Gandhi, and Watzinger to new terms as directors through the 2027 annual meeting.

47. The 2024 Proxy stated that Kurtz and Flower were not independent.

48. The 2024 Proxy stated that the Board had designed processes to manage risk, and that the Audit Committee was responsible for "risk assessment and risk management, including the Company's policies and practices pertaining to financial accounting, investment, tax, and cybersecurity matters, and discusses with management the Company's major financial risk exposures."

49. Thus, the 2024 Proxy was materially misleading because it concealed that CrowdStrike lacked an effective process to release software updates. The financial impact of these omitted facts was not revealed until July 19, 2024.

50. On June 21, 2024, the Company filed a Form 8-K with the SEC, disclosing the results from the votes on the proposals contained the proxy. In particular, Austin, Gandhi, and Watzinger were reelected. The misleading disclosures were fundamental to the shareholder approval of the 2024 Proxy's proposals. As a result of the misleading statements and omissions, the Company was harmed.

## VI. DAMAGES TO THE COMPANY

51. As a direct and proximate result of the Individual Defendants' conduct, CrowdStrike has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

  (a) Legal fees incurred in connection with the Securities Class Action and/or the Consumer Litigation;

(b) Any funds paid to settle the Securities Class Action and/or the Consumer Litigation; and

(c) Costs incurred from compensation and benefits paid to defendants who have breached their duties to CrowdStrike.

52. In addition, CrowdStrike's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company still has not fully admitted to the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

53. The actions complained of herein have irreparably damaged CrowdStrike's corporate image and goodwill. For at least the foreseeable future, CrowdStrike will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that CrowdStrike's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.  DERIVATIVE AND DEMAND ALLEGATIONS

54. Plaintiff brings this action derivatively in the right and for the benefit of CrowdStrike to redress injuries suffered, and to be suffered, by CrowdStrike as a direct result of the wrongdoing alleged herein. CrowdStrike is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

55. Plaintiff will adequately and fairly represent the interests of CrowdStrike in enforcing and prosecuting its rights.

56. Plaintiff has continuously been a shareholder of CrowdStrike at times relevant to the wrongdoing complained of and is a current CrowdStrike shareholder.

57. On November 4, 2024, Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein. *See* Exhibit 1. Plaintiff's Demand states that Plaintiff has owned CrowdStrike shares since June 2024. The Demand alleges that, as detailed above, CrowdStrike's controls and procedures were inadequate and that its public disclosures with respect to the same were misleading.

58. Plaintiff has not received a response within a reasonable time following receipt of the Demand, and as such, the Board has not evaluated its merits in good faith based on all information reasonably available to it.

59. Given the lack of response, the Board has constructively refused the Demand.

60. A majority of the directors who received the Demand were not independent and disinterested. When the Demand was received by the Company, the Board consisted of defendants Kurtz, Austin, Gandhi, Watzinger, Davis, Schumacher, Flower, O'Leary, and Sullivan.

61. Kurtz has been the Company's CEO since 2011, and therefore is not independent under NASDAQ listing rules, and as admitted in the 2024 Proxy. As an employee, Kurtz derives substantially all of his income from his employment with CrowdStrike, and thus could not disinterestedly consider the Demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis. Moreover, he is alleged to have made many of the material misstatements and omissions herein and is a named defendant in the Securities Class Action.

62. The Company admitted in the 2024 Proxy that Defendant Flower was not independent under NASDAQ listing rules. Accordingly, Flower could not disinterestedly consider the Demand.

63. Each of the Individual Defendants managed the Company and was affirmatively aware of significant developments in its core business. The effective rollout of software updates was part and parcel to cybersecurity, the Company's raison d'être. Accordingly, knowledge of the truth regarding the process to rollout software upgrades effectively and without interruption to customers was known by each of the Individual Defendants at all relevant times. The decisions of each Individual Defendant to permit misleading statements and the concealment of material facts were not valid exercises of business judgment. Thus, the entire Board is interested in the subject of the Demand.

64. Further demonstrating the Board's lack of independence and of interestedness, the Board declined to follow the well-established procedure under Delaware law to create a special litigation committee with full authority to decide issues raised by the Demand and appoint to that committee a clearly disinterested and independent outside director or directors.

65. Thus, the Board's failure to act in the face of the foregoing conduct is not a valid exercise of business judgment. Accordingly, a majority of the Board were aware or recklessly disregarded that CrowdStrike's representations to shareholders were materially false and misleading and omitted material information necessary to properly evaluate the Company's controls and procedures, and therefore could not have independently considered the Demand.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

66. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67. Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CrowdStrike's business and affairs, particularly with respect to issues as fundamental as public disclosures.

68. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CrowdStrike.

69. In breach of their fiduciary duties owed to CrowdStrike, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

70. In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

71. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CrowdStrike has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

**(Against Defendants Kurtz, Austin, Gandhi, Watzinger, Davis, Schumacher, Flower, O'Leary, and Sullivan For Violations of Section 14(a) of the Exchange Act)**

72. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

73. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on May 6, 2024 violated §14(a) and Rule 14a-9 because it solicited stockholder approval to reelect Austin, Gandhi, and Watzinger as directors.

74. In the exercise of reasonable care, defendants should have known that the statements contained in the 2024 Proxy were materially false and misleading.

75. The misrepresentations and omissions in the 2024 Proxy were material to Company shareholders in voting on the 2024 Proxy. The 2024 Proxy solicited stockholder votes for: (i) director election; (ii) ratification of the independent accounting firm; and (iii) executive compensation. The 2024 Proxy was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

76. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of CrowdStrike, demands judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of CrowdStrike and that Plaintiff is an adequate representative of the Company;

B. Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CrowdStrike;

C. Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

D. Directing CrowdStrike to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CrowdStrike and its stockholders from a repeat of the damaging events described herein, including,

but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3. a proposal to strengthen CrowdStrike's oversight of its disclosure procedures;

4. a provision to control insider transactions; and

5. a provision to permit the stockholders of CrowdStrike to nominate at least three candidates for election to the Board.

E.  Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of CrowdStrike has an effective remedy;

F.  Awarding to CrowdStrike restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

DATED: April 10, 2025 	Respectfully submitted,

**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**

 /s/ *Stuart L. Cochran*
Stuart L. Cochran
State Bar No. 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3804
Facsimile: (214) 691-6311
Email: scochran@condontobin.com

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
745 Fifth Avenue, Fifth Floor
New York, New York 10151
Telephone: (212) 935-7400
Email: bsachsmichaels@glancylaw.com

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
         prajesh@glancylaw.com

*Counsel for Plaintiff*